**GULF, C. & S. F. RY. CO. v. HINES et al.*
(No. 6414.)**

(Court of Civil Appeals of Texas. Austin. Feb. 8, 1922. Rehearing Denied March 29, 1922.)

1. **Depositions** ☞95—Answers to cross-interrogatories held inadmissible.

In an action against a railway company, where defendant had introduced portions of depositions responsive to direct interrogatories, the court properly refused to permit defendant to introduce in evidence other portions of the depositions in response to cross-interrogatories by plaintiffs, relating to information sought to be elicited in an unsuccessful effort to impeach the weight of the testimony of such witnesses, objected to at the trial on the ground that such evidence was an attempt by defendant to bolster up the depositions of its witnesses previously introduced.

2. **Appeal and error** ☞1062(1)—**Trial** ☞352(5)—Special issue held to combine two issues, but was not reversible error, where issues later separately submitted and answered.

In action against railway for damage to shipment of cattle, a special issue, answered in

the negative, whether the shipment was handled with a reasonable degree of care and within a reasonable time, violated Vernon's Sayles' Ann. Civ. St. 1914, art. 1984a, in joining two issues in one question, but was harmless error, where the issues of negligent handling and unreasonable delay were, by other issues, separately submitted and answered adversely to appellant railway.

**3. Appeal and error ☞930(3)—Finding adverse to appellant presumed on issue not requested to be submitted.**

Where no charge submitting an issue has been requested by appellant, it is presumed in support of the judgment that the trial court found against appellant on that issue, where there is evidence to support such implied finding.

**4. Carriers ☞228(5)—Usual time in making the run not necessary element of proof of unreasonable delay in stock shipment.**

In an action against railway company for damage to shipment of cattle, evidence of the distance of the transportation, the actual time consumed, with the different delays, and testimony by one plaintiff that, outside of the time lost at division points, there was a loss of at least 30 hours in making the shipment, at sidings and way stations, was sufficient to raise the issue of unreasonable delay, and it was not necessary to show the ordinary time in making such a shipment.

**5. Carriers ☞219(6)—Liability of initial carrier as to loss on interstate shipment caused by connecting carrier held not changed by Cummins Amendment regardless of limitation.**

The liability of an initial carrier, by virtue of the Carmack Amendment (U. S. Comp. St. §§ 8604a, 8604aa), for damage to interstate shipment sustained on lines of connecting carriers as well as on its own line, regardless of limitations in the contract of shipment, is not changed by the Cummins Amendment (U. S. Comp. St. § 8604a), the words "when transported on a through bill of lading" in the latter act being intended to qualify only the words in immediate association with it, that is, the case of property passing from a point in the United States to a point in an adjacent foreign country, and not a case of shipment wholly within the United States, so that, in the case of an interstate shipment, it is immaterial, as respects such liability, what the form of contract issued by the carrier may be, or whether any contract at all be issued.

**6. Carriers ☞219(6)—Contracts for interstate shipment of cattle held "through bills of lading" within Cummins Amendment making void limitation of liability.**

Contracts issued by connecting carriers for interstate shipment of cattle *held* through bills of lading within the Cummins Amendment, making void clauses therein limiting liability for damage caused by connecting carrier.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Through Bill of Lading.]

On Rehearing.

**7. Evidence ☞318(4)—Report of veterinary held inadmissible.**

In action for damages to shipment of cattle, the written report of a veterinary who examined the cattle, which report was made to the railway company alone, and was objected to, as hearsay, as made out of the presence of plaintiffs, and as an attempt to bolster up the testimony of such witness, *held* properly excluded, especially where the witness testified fully as to his examination and refreshed his memory from the written report.

Appeal from District Court, Coleman County; J. O. Woodward, Judge.

Action by G. D. Hines and others against the Gulf, Colorado & Santa Fé Railway Company. From judgment for plaintiffs, defendant appeals. Affirmed.

Snodgrass & Dibrell, of Coleman, and Terry, Cavin & Mills and O. B. Wigley, all of Galveston, for appellant.

Baker & Weatherred, of Coleman, for appellee.

BRADY, J. This is a suit for the recovery of damages arising out of a shipment of cattle over the lines of the appellant, Gulf, Colorado & Santa Fé Railway Company, and a connecting carrier. The shipment was delivered to appellant, as the initial carrier, August 16, 1917, at San Angelo, Tex., for transportation and delivery to appellees at Stringtown, Okl. The grounds of negligence alleged were unreasonable delay in transportation and rough handling of the shipment en route. The case was submitted to the jury on special issues, the questions and answers being as follows:

"1. Was the shipment of cattle in question handled by the Gulf, Colorado & Santa Fé Railway Company or its connecting carriers with a reasonable degree of care and caution and within a reasonable time? Answer: No.

"2. Was the Gulf, Colorado & Santa Fé Railway Company or its connecting carriers negligent in handling the shipment of cattle in question? Answer: Yes.

"3. Was there a market value for the 582 head of cattle mentioned in plaintiff's petition at Stringtown, Okl., at the time of the arrival of said shipment of cattle and at the time same should have arrived, had it not been for such negligence, if any, while en route, per head? Answer: Yes.

"4. What was the market value of the 582 head of cattle mentioned in plaintiff's petition per head at the time they arrived and those that should have arrived at Stringtown, Okl., had it not been for the negligence, if any, of defendant, Gulf, Colorado & Santa Fé Railway Company, or its connecting carriers? Answer: $41.00.

"5. What was the intrinsic value of the 582 head of cattle mentioned in plaintiff's petition, at Stringtown, Okl., per head, at the time they

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

arrived there, and those that should have arrived, had it not been for the negligence, if any, of the defendant railway company, or its connecting carriers? Answer: $41.00.

"6. What was the market value of the 486 head of cattle mentioned in plaintiff's petition at Stringtown, Okl., at the time and in the condition they arrived there, per head? Answer: $40.00.

"7. What was the intrinsic value of the 486 head of cattle per head, mentioned in plaintiff's petition at Stringtown, Okl., at the time and in the condition they arrived there, per head? Answer: $40.00.

"8. Was there a market value for the dead cattle and crippled cattle, if any, that died in a few days after the arrival at Stringtown, Okl., at the time of the arrival of the shipment in question? Answer: No.

"9. If you have answered this question in the affirmative, then what was the market value per head? Answer: None, per head.

"10. Was there any intrinsic value for the dead and crippled cattle that died in a few days after they arrived at Stringtown, Okl., at the time said cattle arrived at Stringtown, Okl., per head? Answer: No.

"11. If you have answered question No. 10 in the affirmative, then what was the intrinsic value, per head, of the dead and crippled cattle that died in a few days after they arrived at Stringtown, Okl.? Answer: None per head.

"12. Did the condition of the cattle at the time of shipment contribute to the loss or damage, if any, to the cattle in course of transportation? Answer: Yes.

"13. Was the damage, if any, to said cattle caused by the starved and weakened condition, if any, of said cattle? Answer: Yes.

"14. If you have answered the questions Nos. 12 and 13 in the affirmative, then you will answer what amount, as stated in dollars and cents, they were so damaged, if any? Answer: $1,215.00.

"15. Was there any unreasonable delay in transportation of the 22 cars of plaintiff's cattle that arrived at Stringtown, Okl.? Answer: Yes.

"16. How much loss or damage, if any, occurred to the cattle in controversy by reason of their being in a poor and thin condition, if you find they were in such condition at the time they were shipped? Answer: $1,215.00."

Upon this verdict, judgment was rendered for appellees for $3,046, with interest.

### Opinion.

There are some 200 assignments of error set out in the brief, but the cause has been submitted here upon 17 propositions. It will not be practicable to discuss all the questions presented, although they have been carefully considered. We shall confine the discussion to the principal questions raised and relied upon for reversal.

Appellant complains of the refusal of the trial court to give a number of requested special issues. Most of these issues were submitted by the court in the main charge, although, perhaps, in a different form. Some of them required findings as to the damage done on the line of the appellant alone, as distinguished from the damages occurring on the line of the connecting carrier. Under our view of the law, as hereinafter indicated, appellant was not entitled to have the damages separated, as it was liable for the entire loss; it being the initial carrier, and the shipment being interstate. We do not think there had been any substantial violation of the rule that each party is entitled to have grouped and presented to the jury the particular matter or matters constituting his cause of action or defense. Therefore the proposition raising these questions is overruled.

[1] Another point, presented by various assignments, is that the court erred in refusing to permit appellant to introduce in evidence portions of the deposition of certain witnesses, in response to cross-interrogatories propounded by appellees. The railway company had introduced in evidence portions of the depositions of these witnesses responsive to the direct interrogatories. The cross-interrogatories in question related to information which was sought to be elicited in an effort to impeach or impair the weight of the testimony of these witnesses. They seem to have been anticipatory in character, by which appellees hoped to show that the witnesses had been furnished written data for their answers by the railway company, or that they had previously received copies of the interrogatories, or that representatives of the railway company were present at the taking of the depositions, and similar matters. The answers to the cross-interrogatories were responsive, but they were objected to on the ground that such evidence was an attempt on the part of the railway company to bolster up the depositions of its witnesses previously introduced, and was immaterial, incompetent, irrelevant, etc. We have been cited to the case of Evertson v. Warrach, 132 S. W. 514, a decision by the Court of Civil Appeals for the First District, upon a very similar question. It is there held that a party cannot by interrogatories call for declarations or statements, and because they turn out to be favorable to his adversary object to the same as inadmissible, even though they would not be admissible if offered by the other party. The holding is summarized in this proposition:

"Appellant cannot thus speculate upon the testimony of the witnesses, provided the answers be such as are really called for by the interrogatories."

The learned judge who wrote the opinion stated that the objections were to the entire deposition, much of which was absolutely unobjectionable, on several grounds, including the claim that the answers were self-serving.

We think the decision might well have been based upon the ground just suggested, that the objection was to the entire deposi-

tion; whereas, a great portion of it was admissible and unobjectionable. However, the court proceeded to hold as above indicated, and the decision seems quite analogous. But, if it is not to be distinguished from the present case, we cannot follow it as authority for the proposition that the exclusion of the testimony here being considered was reversible error.

It must be borne in mind that these were not questions propounded to a witness on the stand, but the testimony was taken by deposition. There is no intimation that there was any evidence offered by appellees to prove the matters involved in the answers responsive to the cross-interrogatories. It seems that no effort was made by them to raise such an issue on the trial, and so far as the jury knew appellant's witnesses were not sought to be discredited, or the weight of their testimony challenged by any showing of these matters. In such a situation, we think the answers were objectionable when offered by appellant as being an effort to bolster up its witnesses. In any event, we cannot see how the exclusion of such evidence was harmful to appellant or constituted reversible error. The assignments relevant to this proposition are all overruled.

[2] It is also urged that the court committed reversible error in submitting special issue No. 1 to the jury, because the question combined two issues in one. This question was as follows:

"Was the shipment of cattle in question handled by the Gulf, Colorado & Santa Fé Railway Company or its connecting carriers with a reasonable degree of care and caution and within a reasonable time?"

It is urged specially that this was prejudicial because the answer of the jury to this question was, "No," leaving it uncertain whether the jury intended to hold that a railway company was guilty of 'negligence in both particulars. We think this question does substantially join two issues in one question. In such form it seems to be not only violative of the statute, article 1984a, Vernon's Sayles' Civil Statutes, but also is condemned by decisions of our courts, including the following: Radford Grocery Co. v. Jamison (Tex. Civ. App.) 221 S. W. 998; Transfer Co. v. Motor Co. (Tex. Civ. App.) 222 S. W. 688; Watkins v. Hines (Tex. Civ. App.) 214 S. W. 663. However, we do not think this matter constitutes reversible error, because it was manifestly harmless. As answered by the jury, this issue was resolved to the effect that the railway company had not exercised due care both in handling the shipment and in transporting it within a reasonable time. If this were all, it might be that the case would have to be reversed; but in question No. 2 there was submitted to the jury separately the question of negligence in handling the shipment. In question No.

15 there was specifically and separately submitted the question of unreasonable delay in transportation. Both these issues were answered adversely to appellant. Hence we conclude that the improper manner of submission of issue No. 1 was rendered immaterial.

[3] Another complaint is that, in the absence of a finding that the injuries to the cattle were the proximate result of the negligence of appellant, judgment should have been rendered in its favor. In our view of the law, the proposition as thus limited is untenable. If the injuries were the proximate result of negligence by its connecting carrier, then, under the federal statutes, as will be hereinafter shown, appellant would be primarily liable to the shipper for the loss, although having the right of reimbursement against the connecting carrier. Furthermore, it is not shown that appellant asked the submission to the jury of the issue of proximate cause. Under our statute and the settled rule of decisions, it will be presumed, in support of the judgment, where no charge has been requested, that the trial court found against the party complaining, upon that issue. This, of course, is subject to the qualification that there must be evidence to support such implied finding. We hold that, while the evidence was conflicting as to both grounds of negligence, there was sufficient evidence to justify the conclusion that the carriers were each guilty of negligence in both respects, and also that such negligence was the proximate cause of the injuries for which judgment was rendered.

[4] It is further claimed that there was no evidence justifying the submission or supporting the finding of unreasonable delay in the shipment, especially because it was not shown what was the usual and ordinary time in making such a shipment. The distance of the transportation in miles was shown, the actual time consumed, with the delays at different points, and one of the appellees testified that, outside of the time lost at the division points, there was a loss of at least 30 hours in making the shipment, at sidings and way stations. These facts were sufficient, in our opinion, to raise the issue by the evidence, and it was not a necessary element in the proof that the usual time of making the run should be shown.

[5] Finally, we come to the discussion of what is perhaps the most difficult and important, and certainly the most interesting and novel, question in the case.

It is complained that, although seasonably requested, the court refused to submit to the jury the issue of what negligence and what damages occurred on the lines of the two carriers, separately and independently of each other, and that both the verdict and judgment include damages occurring on both

lines and arising out of the negligence, if any was shown, occurring on both lines. Appellant insists that in the bill of lading issued by it and the contract made with the shippers the undertaking on its part was to transport only over its own line and that its liability was expressly limited to its own line; therefore it was not liable for damages arising from the negligence of the connecting carrier. The question seems to be one of first impression, as no case, state or federal, has been cited or found involving the same point.

It is conceded that if this question were to be determined by the provisions of what is known as the Carmack Amendment, being the Act of Congress of June 29, 1906, chapter 3591, § 7, 34 Stat. 595 (U. S. Comp. St. §§ 8604a, 8604aa), the stipulations in question would be invalid. So much of that act as is relevant to this question reads as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt. such common carrier, railroad or transportation company from the liability hereby imposed: Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he had under existing law.

"That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

But it is insisted that the Carmack Amendment has in this particular been superseded by what is known as the first Cummins Amendment, enacted March 4, 1915, and found in U. S. Compiled Statutes, § 8604a, as follows:

"Any common carrier, railroad, or transportation company subject to the provisions of this act receiving property for transportation from a point in one state or territory or the District of Columbia to a point in another state, territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one state, territory, or the District of Columbia to a point in another state or territory, or from a point in a state or territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a territory shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void."

It is admitted that the shipment in question, was interstate, but insisted that it was not transported on a through bill of lading, and that, under the Cummins Amendment just quoted, the initial carrier was not prohibited from limiting its liability. In the case of Atlantic C. L. R. Co. v. Riverside Mills, 219 U. S. 186, 31 Sup. Ct. 164, 55 L. Ed. 177, 31 L. R. A. (N. S.) 7, Mr. Justice Lurton, speaking for the Supreme Court, recognized that at common law a carrier, not assuming the obligation of a carrier beyond its own line, would not be liable for a loss through the failure of a connecting carrier, to whom it had in due course safely delivered the goods for further transportation. However, it was held in that case that, by virtue of the provision in the Carmack Amendment, the initial carrier was liable for loss and damage sustained on lines of connecting carriers as well as on its own line, regardless of any limitations in the contract of shipment, and that limitations such as are here involved were void. Indeed, such has been the uniform holding of the Supreme Court since the Carmack Amendment came before it for interpretation. Similar holdings have been made by our own courts in G., H. & S. A. Ry. Co. v. Piper, 52 Tex. Civ. App. 568, 115 S. W. 107; G., H. & S. A. Ry. Co. v. Johnson, (Tex. Civ. App.) 133 S. W. 725; H. & T. C. Ry. Co. v. Lewis, 103 Tex. 452, 129 S. W. 594.

The question here considered must, however, be determined by the proper interpretation and effect of the Cummins Amendment of 1915, quoted above, which was in force at the time the shipments were made. It is manifest that the principal purpose of and change effected by such act was to broaden the scope of the Carmack Amendment, and to extend its policy, from commerce passing from a point in one state to a point in another state so as to include commerce transported from or to a territory or the District of Columbia, or from another point of the United States to a point in an adjacent foreign country, and to prohibit agreements limiting liability.

We are not sure that we know the reasons inducing Congress to make this change in the law. It may have been because of the holding of the courts, such as in Houston E. & W. Tex. Ry. Co. v. Inman, 134 S. W. 275, a decision by the Court of Civil Appeals for the First District of Texas. In that case it was expressly held that the provisions of the Carmack Amendment did not extend to property received for transportation in a state of the federal Union for transportation from that state to a foreign country. But whatever be reason, it is plain that the change in policy adverted to was expressly enacted.

It is insisted that the qualifying words, "when transported on a through bill of lading," relate to each of the several specified kinds of transportation, and that the result of this language is to leave the initial carrier free to limit its liability to its own line, where it has not issued, or the property is not transported on, a through bill of lading. In view of the history of this legislation and of the policy of the Carmack Amendment, it is the opinion of the court that by the language in question, introduced for the first time in the Cummins Amendment, Congress intended only to recognize that all such shipments were through shipments, and must be considered as transportation on through bills of lading, no matter what form of contract was issued by the carriers or whether any at all was issued. In other words, that there was merely a recognition of what was already the necessary effect of the Carmack Amendment, and that the phrase, "through bill of lading," was but generally descriptive of the contracts contemplated, and made the duty of the initial carrier to issue. While inclined to this view, the writer is by no means certain that this is the proper intention to impute to Congress. It would seem that if such were the purpose there would really have· been no necessity for the inclusion of this language, since the Carmack Amendment as interpreted by the Supreme Court had been given that effect. The phrase would seem more appropriately to be language intended as qualifying and restrictive of the prohibitions in the associated provisions.

However, there is another view upon which we all fully agree. It has been stated that the obvious leading purpose of the Amendment of March 4, 1915, was to extend the provisions of the act to commerce passing from a territory or the District of Columbia to a point in another state, territory, or District of Columbia, or from any point in the United States to a point in an adjacent foreign country, and to prohibit all agreements having the effect defined by that statute. Disregarding the punctuation, which we are certainly at liberty to do in order to ascertain the intent of the law, and viewing the matter from the history of the legislation and the four corners of the act, there is strong reason to believe that the language, "when transported on a through bill of lading," was intended to qualify only the words in immediate association with it; that is to say, the case of property passing from a point in the United States to a point in an adjacent foreign country. In each case where this language is used, it is immediately preceded by the phrase, "within an adjacent foreign country." It is reasonable to conclude that Congress intended to provide a different rule in the instance of property received for transportation in a state or territory, or the District of Columbia, for transportation within an adjacent foreign country, than when the shipment was to be wholly within this country. Aside from any question of the constitutional power of Congress to prescribe an arbitrary rule, forbidding a common carrier to contract against liability, and making it responsible for the negligence of connecting carriers, where such carrier would have to look to the dubious remedy of reimbursement from foreign carriers, it is entirely reasonable to conclude that Congress did not deem it just to extend this rule to such cases, except when the initial carrier voluntarily chose to issue a through bill of lading. In such case it might well be presumed that the initial carrier had such contract arrangements with foreign carriers as would enable it to collect reimbursement where it had been made to pay for the default of the latter, or was satisfied to take the risk of such enforcement; but if compelled by the provisions of the act to issue such a contract, in any event, it would be unreasonable and unjust. But whether we are right in the reasons we have suggested, we are convinced that it was not the intention of Congress to so change the policy of the Carmack Amendment as to virtually place it within the power of carriers to nullify that policy. It is obvious that, if the interpretation claimed by appellant is correct, every carrer handling either purely interstate shipments, or shipments destined to a foreign country, could, by its own acts, restore the situation as it existed before the Carmack Amendment. By refusing to issue through bills of lading, and by issuing instead contracts for transportation over its own line

only, to be delivered to connecting carriers, but limiting its liability to its own line, the common-law rule would be revived, and such carrier would be held to have assumed no obligation beyond the terms of such contract. This would effect such a radical change of policy, and would be such a backward step, that, in the absence of interpretations by the Supreme Court, we are unwilling to place such a construction upon the Cummins Amendment. Such an indirect repeal of the wholesome policy of the Carmack Amendment is not to be favored, in the absence of language more clearly indicating the purpose of Congress. As was said by Stone, Circuit Judge, in Chicago, M. & St. Paul Ry. Co. v. McCaull-Dinsmore Co., 260 Fed. 837, 171 C. C. A. 563:

"The Cummins Amendment was not concerned alone with preventing contracts already illegal under the common law, but with prohibiting all agreements having the effect defined by that statute. Congress passed this act to remedy the defects in the Carmack Amendment * * * as developed in the case of Adams Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257, and intended thereby to fully and finally prevent all limitations of this character."

Therefore we hold that the prohibitions of the Amendment extend to a shipment purely interstate in character, no matter what the form of the contract issued by the carrier may be, or whether any contract at all may be issued, when the property is received for transportation from a point in one state to a point in another.

[6] In any event, we are constrained to decide that the contracts here involved are, within the terms and meaning of the Cummins Amendment, to be deemed shipments on through bills of lading. While it is true that the connecting carrier, Missouri, Kansas & Texas Railway Company, issued new and independent contracts at Fort Worth, under which the shipments moved to destination, radically differing in form and perhaps in substance from the initial contracts of appellant, it is nevertheless true that appellant received the shipments and contracts for their transportation on through rates, and with full knowledge that the cattle were destined for interstate shipment. It is stated in the contracts of appellant that it agreed to receive and transport the cattle "from San Angelo station to Forth Worth, Tex. (where shipment leaves our rails), consigned to G. E. Hines & Son, Stringtown, Okl." Furthermore, the contracts on their face show that the live stock was to be delivered to connecting carriers, and it is therein "expressly agreed that in case of through transportation this contract shall be for and inure to the benefit of any carrier constituting a part of a through line, and such carrier shall be liable to perform all the obligations of this contract." These contracts were signed by the shippers and were signed on behalf of the carrier in the following language:

"Gulf, Colorado & Santa Fé Railway Company and Connecting Carriers (Severally). By H. E. Everheart, its Agent."

While the contracts issued by the Missouri, Kansas & Texas Railway Company did not adopt or even specifically refer to the contracts issued by the initial carrier, they did provide that the connecting carrier would transport the cattle from Fort Worth, Tex., to Stringtown, Okl., "at the rate * * * from San Angelo, Tex., to destination." This is a recognition that the shipments were through shipments from point of origin to destination, and also upon interstate rates for the entire transportation. Hence, whatever may be the proper interpretation of the Cummins Amendment, we conclude that these shipments fall within the prohibitions of the act, and that the clauses in the contracts limiting liability are void.

While all the questions raised have not been discussed, they have been given careful consideration, and all assignments and propositions are overruled.

Finding no reversible error, the judgment will be affirmed.

### On Rehearing.

In the argument upon motion for rehearing, counsel for appellant chiefly urge us to recede from our holding that the findings of the jury, upon the principal issues of negligence, are supported by evidence. A renewed examination of the evidence convinces us that we were right in holding that the evidence was conflicting, and the answers of the jury are binding upon us.

[7] We should not write at all upon rehearing, except for the request of counsel that we indicate the reasons for overruling their eleventh proposition, which relates to the refusal of the trial court to admit the written report of the veterinary, who made an examination of a large number of the dead and dying cattle, at the Fort Worth stockyards. This report was made to appellant alone, and was objected to because hearsay, made out of the presence of appellees, and was an attempt to bolster up the testimony of the witness.

We are of the opinion that this ex parte report was clearly hearsay and incompetent evidence, and the court did not err in excluding it. Moreover, it is stated in the brief for appellees, without contradiction, that this witness testified fully as to results of his examination of the cattle and refreshed his memory from said written report.

We have carefully considered the motion, upon all points, and believe we have correctly decided the case. The motion is overruled.

Motion overruled.