To the same effect are Mansfield v. Mansfield, 13 Mass. 412; Garnett v. Garnett, 114 Mass. 379, 19 Am. Rep. 369; Kerlik v. Kerlik, 30 Ohio Cir. Ct. 274; Douglass v. Douglass, 31 Iowa, 421; Harrigan v. Harrigan, 135 Cal. 397, 67 Pac. 506, 87 Am. St. Rep. 118; Stratford v. Stratford, 92 N. C. 297; Rathbun v. Rathbun, 40 How. Pr. (N. Y.) 328; Lewis v. Lewis, 60 Okl. 60, 158 Pac. 368; Huston v. Huston, 150 Ky. 353, 150 S. W 386.

We recommend that the question be answered in the affirmative.

CURETON, C. J. The opinion of the Commission of Appeals, answering certified questions, adopted, and ordered certified to the Court of Civil Appeals.

---

## GULF, C. & S. F. RY. CO. v. HINES et al.
### (No. 423-3786.)

(Commission of Appeals of Texas, Section A. May 9, 1923.)

**1. Carriers �köm219(6)—Carrier forbidden to issue any except through bill of lading for interstate shipment.**

Under the Carmack Act and the Cummins Amendment (U. S. Comp. St. § 8604a), interstate transportation implies an interstate or through bill of lading, and if the initial carrier issue any other kind, with the intention to limit its responsibility for the entire loss or damage to a shipment of live stock, such bill is unlawful and void.

**2. Carriers �P=180(2)—Cummins Amendment to Carmack Act held to require through bill of lading for interstate shipment.**

The Cummins Amendment to the Carmack Act (U. S. Comp. St. § 8604a), requiring through bills of lading for interstate shipments, and making the initial carrier liable for negligence of connecting lines, does not, by the use of the words "when transported on a through bill of lading," authorize any other bill of lading for such a shipment, but is used to designate the kind of contract which the initial carrier is required to make.

**3. Carriers ⊝=219(7)—Bill of lading for interstate shipment held to be a through bill of lading.**

A bill of lading issued by an initial carrier for a shipment of cattle, reciting the name of the carrier, that of the shipper, the route of the shipment, the consignee, and that the charges were fixed by established and published tariffs and rules, held a through bill of lading, within the Cummins Amendment to the Car-

mack Act (U. S. Comp. St. § 8604a), notwithstanding it attempted to limit liability of the initial carrier to its own lines.

**4. Carriers ⊝=219(7)—Bills of lading issued by connecting carriers held without consideration and void.**

Where the initial carrier, in the bill of lading for an interstate shipment of cattle, attempted to limit its liability to its own lines, and the connecting carriers issued similar bills of lading, such bills of lading issued by the connecting carrier were without consideration and void; the initial carrier being required to issue a through bill of lading under the Cummins Amendment to the Carmack Act (U. S. Comp. St. § 8604a).

**5. Carriers ⊝=51 — In case of reasonable doubt, construction of bill of lading should be resolved against carrier.**

If there be any reasonable doubt as to the proper construction of a bill of lading, it should be resolved against the carrier.

**6. Carriers ⊝=230(1)—Amount of damage to live stock, caused by poor condition when shipped, held for jury.**

In an action for damages to a shipment of live stock, evidence *held* to sustain a finding that injury was caused by the acts of the carrier, the issue as to what part of damages was due to the condition of the cattle when shipped being one for the jury.

**7. Appeal and error ⊝=930(3)—In absence of request, it will be presumed that court made necessary and proper findings to sustain its judgment.**

In an action against a carrier for injuries to live stock during transit, where it appeared that some of the cattle were killed, but there was no specific finding of the jury as to the number of cattle killed, nor that the negligence of the carriers was the proximate cause of the loss and damage, nor that there was any request for such findings, but there was evidence to warrant such findings, it will be presumed that the court made the necessary and proper findings.

Error to Court of Civil Appeals of Third Supreme Judicial District.

Action by G. D. Hines and others against the Gulf, Colorado & Santa Fé Railway Company. Judgment for plaintiffs was affirmed by the Court of Civil Appeals (239 S. W. 244), and defendant brings error. Affirmed, as recommended by the Commission of Appeals.

O. B. Wigley, of Galveston, Snodgrass & Dibrell, of Coleman, and Terry, Cavin & Mills, of Galveston, for plaintiff in error.

Baker & Weattherred, of Coleman, for defendants in error.

GERMAN, J. G. D. Hines and others brought this suit against the Gulf, Colorado & Santa Fé Railway Company in the district court of Coleman county to recover damages caused to a shipment of cattle from San

Angelo, Tex.; to Stringtown, Okl. The damages claimed were for 96 head of cattle killed and for depreciation in the value of others. The negligence alleged was unreasonable delay in transportation and rough handling.

The railway company interposed two defenses: First, that this was an interstate shipment, not made on a through bill of lading, but on a contract for transportation by the defendant over its line alone, limiting its liability to loss and damages to its own line, and that no loss or damage resulted to the cattle by reason of its negligence; second, that the loss and injury resulted solely from the poor and weak condition of the cattle at the time they were shipped, and not because of any negligent acts on the part of defendant or its connecting lines. The case was submitted to the jury on 16 special issues. The issues necessary to be considered here and the answers thereto are as follows:

"1. Was the shipment of cattle in question handled by the Gulf, Colorado & Santa Fé Railway Company or its connecting carriers with a reasonable degree of care and caution and within a reasonable time? Answer: No.

"2. Was the Gulf, Colorado & Santa Fé Railway Company or its connecting carriers negligent in handling the shipment of cattle in question? Answer: Yes.

"3. Was there a market value for the 582 head of cattle mentioned in plaintiff's petition at Stringtown, Okl., at the time of the arrival of said shipment of cattle, and at the time same should have arrived, had it not been for such negligence, if any, while en route, per head? Answer: Yes.

"4. What was the market value of the 582 head of cattle mentioned in plaintiff's petition per head at the time they arrived, and those that should have arrived at Stringtown, Okl., had it not been for the negligence, if any, of defendant Gulf, Colorado & Santa Fé Railway Company or its connecting carriers? Answer: $41.00."

"6. What was the market value of the 486 head of cattle mentioned in plaintiff's petition at Stringtown, Okl., at the time and in the condition they arrived there per head? Answer: $40.00."

"12. Did the condition of the cattle at the time of shipment contribute to the loss or damage, if any, to the cattle in course of transportation? Answer: Yes.

"13. Was the damage, if any, to said cattle, caused by the starved and weakened condition, if any, of said cattle? Answer: Yes.

"14. If you have answered the questions Nos. 12 and 13 in the affirmative, then you will answer what amount, as stated in dollars and cents, they were so damaged, if any? Answer: $1,215.00.

"15. Was there any unreasonable delay in transportation of the 22 cars of plaintiff's cattle that arrived at Stringtown, Okl.? Answer: Yes.

"16. How much loss or damage, if any, occurred to the cattle in controversy by reason of their being in a poor and thin condition, if you find they were in such condition at the time they were shipped? Answer: $1,215.00."

Upon these findings the trial court entered judgment in favor of plaintiffs for $3,046, with interest. It appears this amount was arrived at by allowing $41 per head for 96 head of cattle killed and $1 per head damage to 486 head of living cattle, then deducting $1,215 found by the jury to be due to the condition of the cattle, and also $161 paid for dead cattle at Fort Worth. On appeal to the Court of Civil Appeals for the Third District, the judgment of the district court was affirmed. 239 S. W. 244.

Seven of the assignments of error in petition for writ of error in one form or another present the following proposition: The shipment being interstate, and not moving on through bill of lading, and plaintiff in error having expressly limited its liability to loss and damage occurring on its own line, it was not liable for loss not occurring thereon. This presents the question of real importance in the case. Counsel for plaintiff in error admit that, but for the first Cummins Amendment to the Carmack Act, dated March 4, 1915 (U. S. Comp. St. § 8604a), there would be no merit in its contention. The Cummins Amendment, so far as applicable to this case, is as follows:

"Any common carrier, railroad, or transportation company subject to the provisions of this act receiving property for transportation from a point in one state or territory or the District of Columbia to a point in another state, territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed, and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one state, territory, or the District of Columbia to a point in another state or territory, or from a point in a state or territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a territory shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or lim-

itation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void. * * * "

It is the contention of counsel for plaintiff in error that the expression, "when transported on a through bill of lading," contained in this amendment, indicates an intention on the part of Congress to prevent limitation of liability only when the shipment moved on a through bill of lading, and when the bill of lading was not a through one it left the initial carrier free to limit liability to loss and damage occurring on its own line. Having reached the conclusion that the bill of lading, issued in this instance, was a "through bill of lading," it becomes unnecessary to enter upon an extended discussion of the meaning and purpose of this amendment.

[1] Briefly it may be stated that the object of the Carmack Act (U. S. Comp. St. § 8604a), which has not been impaired, but broadened and reinforced by the Cummins Amendments, was to require the initial carrier, receiving freight for interstate transportation, to obligate itself to convey the same to the point of destination, using the lines of connecting carriers as its agencies, thus securing for the shipper unity of transportation and responsibility. As regards interstate shipments the several carriers must be treated, not as independent contracting parties, but as one system; and the connecting lines become in effect mere agents, whose duty it is to forward the shipment under the terms of the contract made by their principal, the initial carrier. The law requires the initial carrier to contract for through transportation; in fact, such contract is implied by the receiving of the shipment for transportation to an interstate point. Interstate transportation implies an interstate or through bill of lading, and if the initial carrier issued any other kind, the intention being to thereby limit its responsibility for the entire loss or damage, such instrument, by the very terms of the act itself, is unlawful and void. M., K. & T. Ry. Co. of Texas v. Ward, 244 U. S. 383, 37 Sup. Ct. 1617, 61 L. Ed. 1213; Railway Co. v. Blish Milling Co., 241 U. S. 192, 36 Sup. Ct. 541, 60 L. Ed. 948; G., H. & S. A. Ry. Co. v. Wallace, 223 U. S. 481, 32 Sup. Ct. 205, 56 L. Ed. 516; Railroad & Nav. Co. v. McGinn, 258 U. S. 409, 42 Sup. Ct. 332, 66 L. Ed. 689; Roberts, Federal Liability of Carriers, vol. 1, pp. 565–567; 43 I. C. C. 510.

Regardless of the language used, there is no authority which intimates that, by the enactment of the first and second Cummins Amendments (U. S. Comp. St. § 8604a), it was intended to modify or change the original purpose of the Carmack Act, but they are in accord in holding that the intention of these two amendments was to strengthen and extend the purpose of the original statute. Mr. Roberts, in his "Federal Liabilities of Carriers," thus succinctly states the purpose of the Carmack Law:

"One of the reasons which induced the passage of the Carmack Amendment was the desire of Congress to obliterate the diversity of liability of interstate carriers as to loss and damage claims arising out of interstate shipments and to establish one uniform rule of liability throughout the United States. The aim was to establish unity of responsibility. But the overshadowing purpose of Congress in passing the amendment was to remove the burdensome situation of the shipping public in reference to interstate shipments over routes including separate lines of carriers. Under the common law, as explained in the foregoing paragraph, each carrier participating in a through shipment could limit its liability for loss or damage to that occurring on its own lines. Shippers of goods over two or more lines were therefore compelled to ascertain when and where their property was lost or damaged in order to recover against the carrier causing the damage. The obstacles in attempting to determine responsibility for damage to property shipped over different lines were frequently insurmountable, and, in many instances, shippers were remediless. Congress recognized the difficulties involved on the part of shippers when goods were lost in tracing the goods, fixing the liability and recovering the damage. But, on the other hand, the facilities of an initial carrier were found to be much greater than those of the shippers for locating the goods and fixing the liability for loss or damage and the proviso permitting the initial carrier to recover from the carrier on whose lines the loss occurred the amount of damages paid to the owner of the property adequately protected the initial carrier. The object of the statute was to require the initial carrier receiving freight for transportation in interstate commerce to obligate itself to carry to the point of destination, using the lines of the connecting carriers as its agents, thus securing for the shippers unity of transportation and responsibility."

After a discussion of the causes leading to the enactment of the first and second Cummins Amendments, this author summarizes the effect of all the acts in this language:

"The statute, as changed by the two Cummins Amendments, provides that the initial carrier shall be liable for the full actual loss, damage or injury to ordinary live stock caused by it or by any connecting carrier notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any receipt or bill of lading, or any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission. Any such limitation, without respect to the manner or form in which it is sought to be made, is declared by the statute to be unlawful and void."

[2] It is not intended that what we have here stated has reference to shipments from this country to adjacent foreign countries. We are inclined to think that the initial carrier in shipments of that kind might not be required to issue a through bill of lading. The language of the act would so indicate. But if the words, "when transported on a through bill of lading," have any application to ordinary interstate shipments, then they are used to designate the kind of contract which the initial carrier was required to make, and there is no implication that any other character of bill of lading, if intended to limit liability, could lawfully be issued. To give to this law the construction contended for by plaintiff in error would effectively destroy its power to accomplish the purposes Congress had in mind when it was enacted.

[3] But, aside from the effect given the contract of shipment by the terms of the law, we think the bill of lading issued in the present instance, by its own terms, in the light of the attending circumstances, was undoubtedly a "through bill of lading." The material parts of the bill are as follows:

"This contract, made between the Gulf, Colorado & Santa Fé Railway Company, hereinafter called the carrier, and G. D. Hines & Son, of San Angelo, Texas, hereinafter called the shipper, witnesseth: That for the consideration of mutual covenants and conditions herein contained, the carrier will, subject to the rules and regulations in its published tariffs applicable thereto, receive and transport for the shipper the live stock described herein, viz. [here follows description of cars, etc.] from San Angelo station to Fort Worth, Texas (where shipment leaves our rails), consigned to G. D. Hines &· Son, Stringtown, Oklahoma, at the rates and charges for which said live stock may be lawfully carried, as fixed and determined by the established and published tariffs, classifications and rules of said party of the first ·part. * * * It is mutually agreed between the parties hereto as follows: That the carrier shall transport only over its own line and shall not be liable for· loss and damage or injury not occurring on its own road or its portion of any through roads, nor after the said live stock has· been delivered to a connecting carrier, except as such liability may be imposed by law, but it is expressly agreed that in case of through transportation this contract shall be ·for and inure to the benefit of any carrier constituting a part of a through line, and such carrier shall be liable to ·perform all the obligations of· this· contract. * * * [Signed] Gulf, Colorado & Santa Fé Railway Company and Connecting Carriers (Severally), by H. E. Everheart, Its Agent."

Under this contract the cattle were transported by the Santa Fé to Fort Worth, and there delivered to the Missouri, Kansas & Texas Railway· Company of Texas. This company issued new bills of lading, but they expressly adopt as a consideration therefor the through rates fixed in the contract at San Angelo by the Santa Fé Company. The cattle were carried by the Missouri, Kansas & Texas to destination in Oklahoma, where the freight charges for the through transportation were paid.

[4] It conclusively appears that the original contract of carriage contemplated transportation of the cattle by the Santa Fé Company and its connecting lines, as its agents, under a through rate, although it sought to limit its immediate obligations to its own lines. The federal courts and the courts of our own state construe an obligation of this kind as a through bill of lading or contract of transportation. The bills of lading issued by the Missouri, Kansas & Texas at Fort Worth were without consideration and void. M., K. & T. Ry. Co. v. Ward, 244 U. S. 383, 37 Sup. Ct. 617, 61 L. Ed. 1213; Standard Oil Co. v. U. S., 179 Fed. 620, 103 C. C. A. 172; G., H. & S. A. Ry. Co. v. Cattle Co., 105 Tex. 178, 146 S. W. 538; Texas Cent. Ry. Co. v. Hico Oil Mill, 62 Tex. Civ. App. 620, 132 S. W.· 381 (writ denied); Texas & P. Ry. Co. v. Townsend (Tex. Civ. App.) 106 S. W. 760 (writ denied).

[5] It is a well-established rule under the federal authorities that, if there be any reasonable doubt as to the proper construction of a bill of lading, it should be resolved against the carrier. It follows from these conclusions that under the federal statute the plaintiff in error was liable for the entire loss and damage caused by it and its connecting carriers.

[6] There are numerous assignments presented by plaintiff in error, but they were considered by the Court of Civil Appeals, and in our opinion were properly disposed of by that court. However, counsel for plaintiff in error earnestly contend that the evidence conclusively shows that the loss and damage to the cattle was due solely to their weak and starved condition at the time of shipment. ·They urge this contention with much plausibility, in view of the fact that there was no finding by the jury that the negligence of the railway companies was the proximate cause of ·the loss and damage, and in view of the further finding that the condition of the cattle contributed to and was a cause of the loss suffered. While it is apparent that the damages were occasioned to some extent by the impoverished condition of the cattle, yet there was ample evidence of injury caused by acts of the carriers, and the issue as to what part of the damages was due to the condition of the cattle was very properly one for the jury. In the recent case of· Hartford Fire Ins. Co. v. G., H. & S. A. Ry. Co.; decided by this section, in 239 S. W. 919, involving a state of facts very similar to the present case, it was held proper to charge a carrier with liability for damages to weak and impoverished cattle resulting· from the

negligence of the carriers, where the damages resulting from the condition of the cattle were excluded. We have not been able to find any case indicating that the rule under the federal law would be different, and we believe the principles announced in that case are applicable here.

[7] The jury in response to special issues found that the damages due to the condition of the cattle amounted to $1,215, and this amount was deducted from the total damages allowed by the court. It is true that there was no specific finding as to the number of the cattle killed, nor that the negligence of the railway companies was the proximate cause of the loss and damage, but there being ample evidence to warrant such findings, in the absence of a request that those issues be submitted, it will be presumed that the court made the necessary and proper findings.

This case presents an apparent hardship. The record discloses by photographs and otherwise that the cattle, when shipped, were so impoverished as not only to elicit the pity of all humane persons, but as to make it almost impossible to move them over a long distance without serious loss. They were driven from the dipping vats directly into the cars and moved out of San Angelo near the noon hour of an August day. This was about the close of a three years' drought. The distance from San Angelo to Stringtown, Okl., was about 525 miles, and transportation was badly demoralized, due to the recent entrance of this nation into the World War and the demands made upon railway companies by the government. Under these conditions it was inevitable that loss should occur. The jury, in the exercise of the discretion given them, have undertaken to estimate the amount of damage resulting from causes other than the negligent acts of the carrier. They may have placed this damage at too small a sum, and the Court of Civil Appeals might, in its discretion, have reversed and remanded the case because of insufficiency of the evidence. It did not, and it is not within the province of this court to do so. It is far more important for courts to observe the constitutional and statutory restrictions pertaining to their jurisdiction than to seek to remedy an apparent hardship in individual cases.

The trial court and the Court of Civil Appeals having correctly applied the principles of law applicable to the case, we recommend that the judgment be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.